UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X
                                  :

MAURA GARCIA,                    :

                    :      07 Civ. 6658 (DAB)(THK)
           Plaintiff,     :

                    :      **REPORT AND**
         -against-      :      **RECOMMENDATION**

                    :
MICHAEL J. ASTRUE,         :
Commissioner of Social Security,  :

                    :
           Defendant.     :

                    :
-----------------------------------X

**From: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**
**To:   HON. DEBORAH A. BATTS, UNITED STATES DISTRICT JUDGE.**

      Plaintiff, Maura Garcia ("Plaintiff"), commenced this action
pro se pursuant to 42 U.S.C. § 405(g), to obtain judicial review of
the Commissioner of Social Security's determination that she was
not eligible for Supplemental Security Income ("SSI") or disability
insurance benefits ("DIB"). Defendant, the Commissioner of Social
Security ("the Commissioner"), has moved for judgment on the
pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil
Procedure, and the motion was referred to this Court for a Report
and Recommendation in accordance with 28 U.S.C. § 636(b)(1)(B) and
(C) and Rule 72.1(a) of the Local Civil Rules of the Southern
District of New York. Plaintiff has not responded to the motion.
For the following reasons, this Court recommends that Defendant's
motion be granted, and this action be dismissed with prejudice.

**BACKGROUND**

I.   Procedural Background

Plaintiff filed concurrent applications for SSI and DIB on June 30, 2006.  (See Administrative Record ("R.") at 17.)  She alleged that she has been disabled since April 17, 2006, due to the effects of treatment for breast cancer.  (See id. at 47.)  Her application was denied, and Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ").  (See id. at 31.)  On December 27, 2006, ALJ Robin J. Arzt held a hearing, at which Plaintiff testified regarding her breast cancer and a dysthymic disorder, which she claimed also qualified as a disability.  (See id. at 196-212.)  By a decision dated January 17, 2007, the ALJ found that Plaintiff was not disabled under the Social Security Act.  (See id. at 17-23.)  On June 14, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's opinion the final decision of the Commissioner.  (See id. at 3-5).  This action followed.

II.  Factual Background

    A.   Non-Medical Evidence

Plaintiff was born on September 22, 1961 in the Dominican Republic.  (See id. at 34, 54, 206.)  She graduated from high school there, and moved to the United States in 1985; however, she stated at the hearing that she does not speak or understand

2

English.[1]  (See id. at 207.)  From 1999 to 2005, Plaintiff was employed as a maintenance worker.  (See id. at 56.)  From April 2005 through April 2006, she worked as a licensed cosmetologist, which entailed applying makeup and cutting hair, either in a salon or in the homes of her clients, for three days a week, five hours per day.[2]  (See id.)  According to Plaintiff, this job was performed primarily while standing, and involved lifting less than ten pounds.  (See id. at 56-57, 208.)

### B. Medical Evidence

#### 1.    Diagnosis and Initial Treatment

In March 2006, Plaintiff was diagnosed with breast cancer. (See id. at 116, 123.)  On April 19, 2006, Plaintiff underwent a left lumpectomy and sentinel node dissection.  (See id. at 107-08, 174-75.)  A post-surgical pathology report confirmed the presence of left breast cancer.  (See id. at 114-15, 169-71.)  On May 10, 2006, Plaintiff underwent a re-excision biopsy with axillary lymph node dissection.  (See id. at 141, 176-77.)  A subsequent pathology test did not show any further carcinoma.  (See id. at 149-50, 172-73.)

---

[1] Previously, in a form that she submitted to the Social Security Administration, Plaintiff indicated that she could read and understand English.  (See id. at 46.)

[2] Plaintiff provides contradictory accounts of the exact nature of this employment.  In her written application for SSI and DIB, Plaintiff asserted that she worked at a salon, whereas in her oral testimony, she stated she worked on a freelance basis ("privately") and went to her clients' homes.  (See id. at 56, 210.)

On May 26, 2006, Plaintiff underwent CT-scans of her abdomen, pelvis, and chest.  (See id. at 118, 152-53, 179-80.)  These scans showed no evidence of metastasis.  (See id.)  A whole body bone scan, performed on May 30, 2006, also showed no evidence of metastasis.  (See id. at 151.)

### 2.    Chemotherapy and Radiation

Plaintiff began chemotherapy on June 7, 2006, and completed her eighth and last cycle of this treatment on September 21, 2006. (See id. at 201.)    Her treatment included the use of the medications Doxorubicin, Cyclophosphamide, and Paclitaxel.  (See id. at 161.)  She subsequently underwent local radiation treatment, between October to December 5, 2006.

### 3.    Treating Physician

On May 24 and 31, 2006, Plaintiff was examined by her treating physician, Dr. Thomas Uldrick ("Dr. Uldrick"), of the New York-Presbyterian Hospital Oncology Clinic.  (See id. at 109-10, 111-12.)  Uldrick noted that Plaintiff was healing from surgery, and had no arm swelling or neurological symptoms, but did have healing surgical scars under her left breast.  (See id. 109, 111.)

On June 21, 2006, Dr. Uldrick examined Plaintiff again, and wrote a report on her condition.  (See id. at 147-48.)  He noted that Plaintiff was undergoing chemotherapy for stage IIB breast cancer, and that she indicated that she experienced mild nausea and vomiting after this treatment, but had no fever or shortness of breath.  (See id. at 147.)  He also rated Plaintiff at "zero" on

4

the Eastern Cooperative Oncology Group ("ECOG") performance status scale.[3]  (See id.)

Dr. Uldrick examined Plaintiff again on July 12, 2006.  (See id. at 145-46.)  The examination revealed the following: Plaintiff had two small oral ulcers; her abdomen was soft; her lower extremities showed no signs of swelling; and her left breast had a healing hematoma and a surgical scar.  (See id. at 145.)  He noted once more that Plaintiff complained of mild nausea and vomiting following chemotherapy, but had no fever or shortness of breath.  (See id.)  He once more rated Plaintiff at zero on the ECOG scale.  (See id.)

On July 17, 2006, Dr. Uldrick completed another report

_____

[3] The ECOG performance status scale provides criteria that doctors and researchers use to determine the following: the progress of a patient's disease; the impact of the disease on the patient's daily living abilities; and the appropriate treatment and prognosis.  Oken, M.M., Creech, R.H., Tormey, D.C., Horton, J., Davis, T.E., McFadden, E.T., Carbone, P.P.: Toxicity and Response Criteria of the Eastern Cooperative Oncology Group.  Am J Clin Oncol 5:649-55, 1982; available at, http://ecog.dfci.harvard.edu/general/perf_stat.html.  The scale is defined as follows:

    0 -  Fully active, able to carry on all pre-disease
         performance without restriction.
    1 -  Restricted in physically strenuous activity but
         ambulatory and able to carry out work of a light or
         sedentary nature, e.g., light house work, office work.
    2 -  Ambulatory and capable of all self-care, but unable to
         carry out any work activities.  Up and about more than
         50% of waking hours.
    3 -  Capable of only limited self-care, confined to bed or
         chair more than 50% of waking hours.
    4 -  Completely disabled.  Cannot carry on any self-care.
         Totally confined to bed or chair.

regarding Plaintiff's condition and functional ability.  (See id. at 160-65.)  He reiterated that Plaintiff had stage IIB breast cancer, although there were no local recurrences or metastases, and clinical testing no longer revealed evidence of the disease.  (See id. at 160-63.)   He also reported once more that Plaintiff's chemotherapy caused her nausea, vomiting (now controlled), and fatigue.  (See id. at 160, 161.)  With respect to Plaintiff's functional abilities, Dr. Uldrick opined that Plaintiff's physical activity was limited by fatigue, and that she was specifically limited in her ability to push and/or pull with her left arm, but that she could occasionally (up to 1/3 of a work day) lift and carry up to five pounds; could stand or walk up to six hours per day; and was unlimited in her ability to sit.  (See id. at 162-64.) He rated Plaintiff at "one" on the ECOG scale, but did not explain his reason for increasing her rating from a "zero."  (See id. at 162.)  He also remarked that he examined Plaintiff every two weeks. (See id. at  160.)

On December 20, 2006, Dr. Uldrick wrote a note stating that Plaintiff had "continued pain due to her Paclitaxel."  (See id. at 195.)

### 4.   Consulting Physician

On July 24, 2006, Dr. B. Gajwani ("Dr. Gajwani"), a state agency medical consultant, responded to a request for medical advice from the New York State Temporary and Disability Assistance Division of Disability Determinations, and reviewed Plaintiff's

medical record. (See id. at 183-84.) After noting that Plaintiff was currently on adjuvant therapy (chemotherapy followed by radiation), Dr. Gajwani stated that the side effects of such treatment ("nausea, fatigue, etc") would be severe, but were expected to subside after the completion of therapy, and that Plaintiff was expected to recover within twelve months of the onset of her condition. (See id. at 184.) He further opined that Plaintiff would be able to return to "at least" light work activity by April 17, 2007, but should avoid heavy lifting in light of her axillary node dissection. (See id.)

Dr. Dajwani's review also included a residual functional capacity assessment. (See id. at 185-90.) He opined that, as of April 17, 2007, Plaintiff would be able to lift and/or carry up to twenty pounds occasionally, and ten pounds frequently. (See id. at 186.) He also noted that Plaintiff could either stand, walk, or sit for a total of six hours in an eight-hour workday, and that she had no postural or other non-exertional limitations. (See id. at 186-88.)

Dr. Dajwani's review concluded that Plaintiff did not meet a "listed impairment"[4] and that "durational denial"[5] of Plaintiff's

---

[4] This term refers to the criteria for establishing disability per se, as set forth in 20 Code of Federal Rules ("C.F.R.") § 404, Subpt. P., App. 1.

[5] This term refers to the statutory requirement that inability to work due to disability must last for a continuous period of at least twelve months for the individual to be found disabled. 42 U.S.C. §§ 423 (d)(1)(A), 1382c(a)(3)(A).

disability claim was appropriate.

        5.   <u>Dysthymic Disorder</u>

On approximately November 20, 2006, Plaintiff sought treatment from a psychologist at New York-Presbyterian. (<u>See</u> <u>id.</u> at 211.) On December 11, 2006, Patricia Harteneck, Ph.D ("Dr. Harteneck"), a psychologist, and Dianna Dragatsi, M.D. ("Dr. Dragatsi"), a psychiatrist, wrote a note stating that Plaintiff was receiving weekly outpatient psychiatric treatment for dysthymic disorder, a depressive disorder. (<u>See</u> <u>id.</u> at 194; American Psychiatric Association's <u>Diagnostic and Statistical Manual of Mental Disorders</u>, 379 (4th ed. Text Revision 2000).) They also noted that, "due to diagnosis of breast cancer, [Plaintiff] can no longer perform the job she used to perform (hairdresser)." (<u>See</u> <u>id.</u> at 194.) They provided no support for this conclusion. On December 14, 2006, Dr. Dragatsi prescribed Plaintiff medication for this disorder. (<u>See</u> <u>id.</u> at 101.)

        C.   <u>Testimonial Evidence</u>

Plaintiff testified that, at the time of her hearing on December 27, 2006, she still experienced bone and joint pain as a consequence of her chemotherapy. (<u>See</u> <u>id.</u> at 202-03.) With respect to her joint pain, Plaintiff stated the following: she experienced the pain every day (although if fluctuated in intensity throughout the day); it was located in her arms, knees, and back; it had subsided somewhat since she concluded chemotherapy; and she treated it with over-the-counter Advil and Tylenol, which Dr.

Uldrick advised her to take, and which partially alleviated it. (See id.)   Plaintiff also testified that, at the time of the hearing, the tips of her fingers and toes felt "frozen" as a result of chemotherapy.   (See id. at 203.)

With respect to functional capabilities, Plaintiff testified as follows: she could not lift her left arm above shoulder level; she could not walk more than two blocks or stand for more than fifteen minutes at a time due to fatigue; she had trouble bending due to leg pain; she could not sit for more than one-half hour without back pain; she occasionally required assistance bathing and dressing herself; and she could carry a gallon of milk (which weighs approximately eight pounds) for a distance of one block with her right hand, but not with her left.   (See id. at 204-06.)

Plaintiff also testified that the only prescription medicine that she used at the time of the hearing was the medicine that Dr. Dragatsi had prescribed for depression, on December 14, 2006.   (See id. at 201-02.)

## DISCUSSION

I.   Governing Law and Standard of Review

For purposes of SSI eligibility, a disability exists if a claimant cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42   U.S.C.   §§   423(d)(1)(A),   1382c(a)(3)(B).      An

9

individual's physical or mental impairment is not disabling under the Act unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claim of disability, the Commissioner must consider objective and subjective factors such as: (1) objective medical facts; (2) diagnoses or medical opinions based on those facts; (3) the claimant or other witnesses' subjective evidence of pain or disability; and (4) the claimant's educational background, age, and work experience. See Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Bluvband v. Heckler, 730 F.2d 886, 891 (2d Cir. 1984); Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983); Miller v. Astrue, 538 F. Supp. 2d 641, 648 (S.D.N.Y. 2008).

The Social Security Administration's regulations set forth a five-step sequence to evaluate disability claims. See 20 C.F.R. § 404.1520. The Second Circuit has explained the sequential evaluation process as follows:

First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a 'severe impairment' that significantly limits the ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the

10

'residual functional capacity' to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing any other work.

Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520, 416.920 & Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)) (footnote omitted)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); DeChirico v. Callahan, 134 F.3d 1177, 1179-80 (2d Cir. 1998).  Claimants must prove their disability in the first four steps in the evaluation.  See Draegert, 311 F.3d at 472; Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983).  The Commissioner must prove, at the fifth step, that the claimant can obtain substantial gainful employment in the national economy.  See Perez, 77 F.3d at 46 ("If the claimant satisfies her burden of proving the requirements in the first four steps, the burden shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working."); accord Butts v. Barnhart, 416 F.3d 101, 103 (2d Cir. 2005); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).

This Court reviews the Commissioner's decision and the administrative record to determine whether the Commissioner's determination was supported by substantial evidence and relied upon the correct legal standard.  See 42 U.S.C. § 405(g); Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004).  "Substantial evidence . . . . means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart,

11

362 F.3d 28, 31 (2d Cir. 2004) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)(internal quotations omitted)).   To determine if the ALJ's decision was supported by substantial evidence, a court must conduct a plenary review of the administrative record.   <u>See</u> <u>Shaw v. Carter</u>, 221 F.3d 126, 131 (2d Cir. 2000).   Where an ALJ's findings are based on substantial evidence, this Court must defer to them. <u>See</u> <u>Barreto ex rel. Rivas v. Barnhart</u>, No. 02 Civ. 4462 (LTS), 2004 WL 1672789, at *3 (S.D.N.Y. July 27, 2004) (citing <u>Rosa</u>, 168 F.3d at 77).

Before applying this standard of review, courts must first determine whether the plaintiff received a full hearing and whether the ALJ complied with his affirmative duty to adequately develop the record and inquire into relevant facts.   <u>See</u> <u>Halloran</u>, 362 F.3d at 31; <u>Cruz v. Sullivan</u>, 912 F.2d 8, 11 (2d Cir. 1990).   In developing the record, the ALJ must discuss the relevant evidence and factors crucial to the overall determination with sufficient specificity to enable reviewing courts to decide whether the determination is supported by substantial evidence.   <u>See</u> <u>Ferraris v. Heckler</u>, 728 F.2d 582, 587 (2d Cir. 1984); <u>Barreto</u>, 2004 WL 1672789, at *3.

II.   <u>The Commissioner's Decision</u>

A.   <u>Full and Fair Hearing</u>

At the outset, the Court concludes that Plaintiff received a full and fair hearing before the ALJ, and the ALJ complied with her affirmative duty to adequately develop the record and inquire into

relevant facts.  See Halloran, 362 F.3d at 31; Cruz, 912 F.2d at
11.   At the hearing, the ALJ inquired into Plaintiff's medical
conditions in order to assess their severity; she also inquired
into Plaintiff's physical abilities and limitations, as well as
Plaintiff's past work experience.  (See R. at 201-06, 208-10.)   In
so doing, the ALJ developed a thorough record of Plaintiff's
medical history, which included opinions from her treating
physician (Dr. Uldrick) and another physician who had evaluated
Plaintiff's conditions (Dr. Gajwani).

        B.   Application of Proper Legal Standards

        The Court also concludes that the ALJ applied the proper legal
standards, correctly following the five-step process to determine
whether Plaintiff was disabled within the meaning of the Social
Security Act.

        At the first step, the ALJ found that Plaintiff was not
engaged in substantial gainful activity since the alleged onset
date of her disability.  (See id. at 18.)   The ALJ then proceeded
to step two and considered whether Plaintiff had a "severe
impairment" that significantly limited her physical or mental
ability to do basic work activities.   See 20 C.F.R. § 404.1520.
The ALJ concluded that Plaintiff's left breast cancer was "severe,"
but that Plaintiff's dysthymia was not, because there was no
evidence that this condition, which was first treated in November,
2006, would last for twelve months or more.  (See id.  at 18, 20.)
The ALJ further noted that the mental health professionals who had

13

treated Plaintiff's dysthymia had "misidentifie[d Plaintiff's] past relevant work experience" when they stated Plaintiff would be unable to perform her past work as a "hairdresser" due to her breast cancer.  (See id. at 20.)

    The ALJ next moved to step three, and determined that Plaintiff's breast cancer was not severe enough to meet or "medically equal" one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  (See id. at 18.)  In light of her finding that Plaintiff did not have a listed impairment, the ALJ proceeded to step four, which entailed determining whether Plaintiff had the residual functional capacity to perform her past relevant work. The ALJ concluded that Plaintiff retained the residual functional capacity to perform a wide range of light work, which included Plaintiff's "past relevant work as a cosmetologist, but not as a maintenance worker."  (See id. at 20.)   Because Plaintiff's functional capacity did not preclude her from performing the demands of her past work as a cosmetologist, the ALJ concluded that Plaintiff was not disabled.  (See id.)

    Alternatively, the ALJ concluded that, even if Plaintiff was unable to perform her past work as cosmetologist, there were still a significant number of jobs in the national economy that Plaintiff could perform.  (See id.)

14

C.   The ALJ's Conclusions Were Supported by Substantial
     Evidence

     1.   Breast Cancer

     The ALJ concluded that Plaintiff's treatment for breast cancer
did not disable Plaintiff.  (See id. at 21-22.)  This conclusion is
supported by substantial evidence, because, as set forth below,
Plaintiff was not suffering from a medical condition that rendered
her unable to work for a continuous period of twelve months from
the alleged onset date of disability – April 17, 2006.

     On reports written on June 21 and July 12, 2006, Plaintiff's
treating physician, Dr. Uldrick, rated Plaintiff at a "zero" on the
ECOG status scale.  (See id. at 145, 147.)  This ranking indicates
that an individual is "[f]ully active [and] able to carry on all
pre-disease performance without restriction."  (See n.3 supra.)
Also, in July 2006, the consulting physician, Dr. Gajwani, stated
that as of April 17, 2007 – exactly twelve months after the alleged
onset of disability – Plaintiff would be able to lift and/or carry
up to twenty pounds occasionally, and ten pounds frequently.  (See
id. at 186.)  He also noted that Plaintiff could either stand,
walk, or sit for a total of six hours in an eight-hour workday, and
that she had no postural or other non-exertional limitations.  (See
id. 186-88.)  Such capabilities would allow Plaintiff to resume her
job as a cosmetologist.  As described by Plaintiff, that job
required standing and lifting less than ten pounds, and lasted for
five hours per day, three days a week.  (See id. at 56-57.)

Thus, Plaintiff was able to engage in gainful activity within twelve months of her alleged onset date of April 17, 2006, because the treating and consulting physicians indicated, respectively, that Plaintiff was able to resume her previous job as cosmetologist two to three months following her alleged onset date (by June or July), and certainly as of April 17, 2007 – exactly twelve months after her alleged onset date. The ALJ's conclusion that Plaintiff's treatment for breast cancer did not disable Plaintiff, therefore, was supported by substantial evidence. Indeed, it was supported by all of the objective medical evidence in the record.

The ALJ's conclusion does, however, disregard some of Plaintiff's testimony. Plaintiff testified that, because of her bone and joint pain, she suffered the following maladies: she could not lift her left arm above shoulder level; she could not walk more than two blocks or stand for more than fifteen minutes at a time due to fatigue; she had trouble bending due to leg pain; she could not sit for more than one-half hour without back pain; and she occasionally required assistance bathing and dressing herself. (See id. at 204-06.)

The ALJ had significant discretion to discount the credibility of Plaintiff's complaints in light of medical findings and other objective evidence. See 20 C.F.R. § 416.929 ("Statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably

16

be expected to produce the pain or other symptoms alleged");
Pietrunti v. Director, Office of Workers' Compensation Programs,
119 F.3d 1035, 1042 (2d Cir. 1997) ("As a fact-finder, the ALJ has
discretion to evaluate the credibility of a claimant and to arrive
at an independent judgment, in light of medical evidence and other
findings.")(internal quotations omitted); see also Mimms v.
Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (same); Brandon v. Bowen,
666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

Consequently, the ALJ was warranted in disregarding
Plaintiff's subjective testimony regarding her pain and the
limitations it allegedly imposed on her functional capacity,
because that testimony was at odds with medical evidence.
Specifically, in July 2006, Dr. Uldrick opined that Plaintiff could
occasionally (up to 1/3 of a work day) lift and carry up to five
pounds; could stand or walk up to six hours per day; and was
unlimited in her ability to sit.    (See R. at 162-64.)    That
assessment of Plaintiff's residual functional capacity directly
contradicts the degree of functional limitation that Plaintiff
averred in her testimony.   Plaintiff's allegations about the extent
of her pain are also undermined by the fact that Dr. Uldrick
recommended only over-the-counter medications, such as Tylenol and
Advil, which Plaintiff stated helped alleviate her pain.    (See
id. at 101, 203.)

The ALJ's conclusion also disregarded the note by Drs.
Dragatsi and Harteneck, which opined that, "due to diagnosis of

17

breast cancer, [Plaintiff] can no longer perform the job she used to perform (hairdresser)." (See id. at 20, 194.) The ALJ's decision not to provide this note with any weight was warranted, however, because it contradicted the clinically-based opinion of Plaintiff's treating physician, and was itself wholly unsubstantiated by any evidence whatsoever. See Rosa, 268 F.3d at 78 ("The opinion of the treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence"). Moreover, the ALJ was also correct in disregarding Drs. Dragatsi and Harteneck's opinion because they had been treating Plaintiff for a mental impairment (dysthimic disorder) for only a few weeks, and thus, unlike Drs. Uldrick and Gajwani, had no basis upon which to opine about the physical effects of Plaintiff's breast cancer.

## 2. Dysthymic Disorder

The ALJ also concluded that Plaintiff's dysthymic disorder did not constitute a disability within the meaning of the Social Security Act. (See id. at 20.) In support of this conclusion, the ALJ stated that, "The record does not include evidence that the claimant has a mental impairment that has lasted or would be expected to last for at least one year." (See id.) The ALJ also noted the absence of any "mental status exam findings" or mental residual functional capacity assessments. (See id.) The ALJ's conclusion is supported by substantial evidence, because, in fact, the record does not contain any evidence suggesting that

18

Plaintiff's dysthyimic disorder would preclude her from engaging in gainful employment for a continuous period of twelve months. Neither Plaintiff's psychologist nor her psychiatrist expressed such an opinion.  Indeed, Plaintiff sought psychiatric treatment only weeks before the hearing.  See Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) ("Substantial evidence is more than a mere scintilla") (internal quotation marks omitted).

CONCLUSION

For the reasons stated above, the Court respectfully recommends that Defendant's motion for judgment on the pleadings be granted, and that the action be dismissed with prejudice.

Under 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6(a) and (d).  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, U.S.D.J., and to the chambers of the undersigned, Room 1660.  Any requests for an extension of time for filing objections must be directed to Judge Batts.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 149-52, 106 S. Ct. 466, 472-73 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

19

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: August 8, 2008
New York, New York

Copies mailed to:

Maura Garcia
564 West 160th Street, #43
New York, New York 10032

John E. Gura, Jr.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007

20